Filed 5/28/26  P. v. Lindo CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084042 |
| v. | (Super.Ct.No. RIF2003469) |
| STEPHEN JOHN LINDO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.  Reversed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Stephanie H. Chow and Anne Spitzberg, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Stephen John Lindo shot and killed his friend and business partner Michael Hinden during a struggle at defendant's property. Defendant was convicted of involuntary manslaughter with the personal use of a firearm. Defendant claims on appeal (1) his due process rights were violated by a series of instructional errors, which requires reversal of his involuntary manslaughter conviction; (2) he is entitled to remand for resentencing as the trial court erroneously relied on aggravating factors in sentencing him to the middle term on the firearm enhancement; and (3) he is entitled to additional custody credit. We conclude that there was prejudicial instructional error and reverse defendant's conviction of involuntary manslaughter.

## FACTUAL AND PROCEDURAL HISTORY

### A. PROCEDURAL HISTORY

Defendant was charged by the Riverside County District Attorney's Office with the murder of Hinden (Pen. Code, § 187, subd. (a)).[1] It was further alleged that defendant personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). He was also charged with attempting to prevent or dissuade Hinden from reporting a crime (§ 136.1, subd. (b)(1)) with the special allegation that he personally and intentionally discharged a firearm (§ 12022.53, subd. (b)). Five aggravating factors were alleged for sentencing.

The jury found defendant guilty of the lesser included offense of involuntary manslaughter within the meaning of section 192, subdivision (b). It found a firearm

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

enhancement true pursuant to section 12022.5, subdivision (a). It found defendant not guilty of dissuading a witness in count 2. The aggravating factors were presented to the jury. The trial court declared a mistrial on the aggravating factors finding that there was a hung jury. The People chose not to retry the aggravating factors. Defendant was sentenced on May 31, 2024, to the low term of two years on the involuntary manslaughter and the midterm of four years on the gun enhancement, for a total of six years in state prison.

B.     FACTUAL HISTORY[2]

1.     *PEOPLE'S CASE-IN-CHIEF*

a.     Relationship Between Defendant and Hinden

Briana Reese dated Hinden for 10 years from 2013 through 2020. Reese met defendant through Hinden. Hinden and defendant had been best friends since they were children. Reese and defendant soon became close friends.

While Hinden was finishing law school, in the beginning of 2015, Reese and defendant moved to California to start a cannabis business. The three began an LLC called Private Stock Veganics (PSV) with each having a 33.3 percent interest. After Hinden graduated from law school, they all lived together in a house in Moreno Valley running PSV. Hinden had the expertise in growing and selling the cannabis; defendant was involved in the manual labor of raising the plants; and Reese "help[ed] on the

---

[2] The People presented extensive evidence of the relationship between Hinden and defendant prior to the shooting in this case and regarding the cannabis industry. We provide a brief summary of these facts as they are not relevant to the instructional issues in this case.

business side of things." Reese explained that new strains of cannabis were developed by cloning and breeding new seeds. Hinden was able to acquire new strains through networking and his reputation in the cannabis industry.

At some point, a man named David Lopez got involved in their business and invested in a property on John Street in Perris. The property was used as a "cannabis grow." Hinden obtained 30 to 40 exclusive genetic strains of cannabis for PSV by 2020 and kept them at the John Street house. PSV paid part of the mortgage for the John Street property. Hinden, Reese and defendant moved from Moreno Valley to Riverside.

Once the three moved to Riverside, Hinden and defendant started to have problems in their relationship. Hinden began consulting with other companies. Defendant maintained the plants at the John Street residence but Reese and Hinden discontinued providing any financial support. Defendant was trying to work with Lopez to keep the Perris property going. They all decided they should discontinue PSV as it was no longer profitable.

On January 2, 2020, Hinden was on the phone, and defendant and Reese were present. Defendant began "muttering things under his breath" about Hinden and was being disrespectful. He laughed at Hinden and called him a "bitch." Hinden confronted defendant after the phone call. They were in the kitchen and defendant hit Hinden on the side of his head with a glass measuring cup, shattering the cup. They then pushed and punched each other. Reese broke them up. Defendant packed some of his belongings and left the home in Reese's car. Hinden had a bump on his head and had a black eye as a result of the incident. Defendant also had a black eye and some scratches on his face.

4

Reese was able to get the three of them together the following evening; defendant and Hinden reconciled. Defendant started sleeping at the John Street house. In April 2020, defendant's crop at the John Street house was not doing well and Reese and Hinden brought him some more plants. Hinden eventually took some of his exclusive strains to the John Street house.

By June 2020 Reese and Hinden advised defendant they would no longer be providing anything to the John Street house. Defendant began posting on social media that he was selling the exclusive strains given to him by Hinden at below market value. Hinden saw these posts and was heartbroken. Hinden had worked hard to keep their genetic strains exclusive to PSV and defendant was just selling them. Hinden and Reese blocked defendant on their cellular telephones and on social media in June 2020.

b.       The Shooting

On October 5, 2020, Hinden and Reese discovered that defendant had given away one their most prized genetic strains called Acapulco Gold, and other exclusive strains. He sold them to a buyer who was known for breeding strains and flooding the market with the new strain.

Reese unblocked defendant's phone number and tried to call him to ask whether he had actually sold the Acapulco Gold. Defendant did not answer but then sent her several text messages telling her that he was " 'dying slow knowing that you hate me.' " Hinden told Reese he was going to go to the John Street house to retrieve his plants. When he left the house, Hinden seemed shocked and hurt. She did not see him take any weapons. Reese was concerned that defendant and Hinden would get into a fight based

5

on prior altercations between them. Reese was aware that defendant had a gun that he brought back from Florida in February 2020. Defendant told Reese that once he acquired the gun, he would never again lose a fight. Hinden did not own a firearm. Hinden told Reese that he was going to videotape everything so " 'good luck pulling a gun on me.' " She was scared for Hinden to go to the house.

There were three calls from Hinden to defendant around 9:37 a.m. on October 5, 2020, that were not answered. Defendant texted Hinden, " 'What did I do now.' " Defendant did not answer another call from Hinden, but then texted Hinden at 9:58 a.m., "My life is shit. What could you possibly want from me?" Hinden responded, " 'About to be worse,' " and " 'Warned you.' " There was then a 13 second phone call between the two. Hinden then texted, " 'Stop texting me. You about to find out what happens to people trying to plot and scheme against me.' " Hinden also sent a message to Lopez that he was going to the John Street house and was going to take care of defendant and the strains of cannabis at the location. He mentioned burning down the house.

Reese tried calling Hinden at 11:06 a.m. but he did not answer. She drove to the John Street residence. It was "swarmed" with police officers. She found out that Hinden was dead.

c.      Investigation

During trial, video surveillance was shown to the jury, which depicted the entire altercation between defendant and Hinden.[3] The video was then shown again slowly

---

[3] This court has reviewed Exhibit 143 and it corresponds to the testimony of Investigator Manjarrez.

with Investigator Manjarrez testifying regarding the video. Defendant walked out of his residence shirtless wearing shorts and had nothing on his waistband at 9:29 a.m. He received three FaceTime calls that he did not pick up from Hinden up until 9:38 a.m. He then went back inside the residence at 9:38 a.m. He emerged with a holster on his waistband. He went back into the residence, and when he came back out, he had a shirt on that covered his waistband and had a Taser in his left hand. Defendant received a missed call from Reese at 9:39 a.m. He texted back stating "Is everything okay" at 9:45 a.m. Investigator Manjarrez then testified regarding the text messages that were also set forth in Reese's testimony.

Hinden arrived at the residence in his Honda at 10:11 a.m. Defendant walked toward the driveway area and stood behind a trash can. Defendant appeared to have the Taser in his right hand and what appeared to be a knife in his left hand. Defendant moved the Taser to his left hand and appeared to pull a firearm from his waistband. Hinden walked to the left of the residence. Hinden had what appeared to be his cellular telephone in his left hand and he grabbed some plants from their pots and slammed them against the house. At that point, defendant approached Hinden with the Taser in his right hand and pointed it at Hinden. Hinden walked away from defendant. Defendant approached Hinden at a quick pace as Hinden was walking away. The firearm was in defendant's left hand. At 10:11 a.m., defendant ran toward Hinden with the Taser raised in his right hand pointing toward Hinden's back. Hinden had his hand near his right pocket.

7

As defendant got closer Hinden turned around and defendant appeared to deploy the Taser. Hinden did not appear to have anything in his hands. The wires for the Taser were too small to see in the video. Hinden grabbed defendant's right wrist with defendant still having the Taser in his hand. Hinden had both of his hands on defendant's right wrist. Hinden had his attention on the Taser in defendant's right hand. At that point, defendant's left hand could be seen moving upward toward the area of Hinden's head and pointing the firearm toward Hinden's head. At that point, at 10:12 a.m., defendant fired the weapon at Hinden at very close range. The casing could be seen ejecting from the weapon. Hinden then moved away from defendant and held his hand to his face. Hinden had nothing in his hands. Defendant dropped the Taser; he moved the firearm into his right hand and moved toward Hinden. Hinden was leaning forward holding his jaw. Defendant approached Hinden and made a motion as though he was going to strike Hinden with the firearm but never struck him. Hinden backed away from defendant.

Hinden could be seen with blood coming out of his mouth. Defendant turned away from Hinden and appeared to walk back toward the house. Defendant turned back and pointed the gun at Hinden. Hinden reached into his pocket with his hand that was not holding his face. It appeared that defendant tried to shoot the gun a second time. Defendant held up the firearm toward Hinden as defendant picked up the Taser. Hinden was "gushing" blood.

Hinden took a cellular telephone from his right pocket and tried to walk toward the front of the residence. Defendant walked toward Hinden, who was bent over, and tucked

8

the Taser into his armpit. Defendant grabbed the cellular telephone from Hinden. Defendant walked away from Hinden taking his cellular telephone with him. Defendant set the phone, firearm and Taser on the ground. He moved back toward Hinden who was lying face down on his stomach. Defendant dragged Hinden to a nearby structure. At one point, Hinden appeared to move his lower body on his own making it appear he was still alive. Defendant picked up the firearm and Taser and walked away from the area where Hinden was lying on the ground.

Defendant walked toward the west end of the property and appeared to be talking on a cellular telephone. It was 10:14 a.m. Two phone calls to "MF" were made from defendant's phone around this time. It was later determined that MF was defendant's father. Defendant walked back to Hinden and rolled him face up. He covered him with a tarp. Defendant then appeared to be moving the surveillance camera and then it stopped recording. Defendant made no 911 calls during this time.

Investigator Manjarrez interpreted the video as showing that Hinden never came at defendant aggressively but rather turned to defendant in a defensive manner to protect himself. It appeared in the video that Hinden had scissors in his pocket but never in his hand.

Defendant was interviewed at the sheriff's station. He had no injuries to his face, torso or on his hands.

Riverside County Sheriff's Department Corporal Brian Chafin responded to the John Street house at 12:20 p.m. on October 5, 2020. Several other deputies arrived at the house. The deputies searched the structures on the property looking for the victim and

9

possible suspects. Defendant was found waiting for the deputies at the bottom of a cliff near the property. Deputies found Hinden, who was deceased, covered with a tarp. No one else was on the property. Cellular telephones for defendant and Hinden were seized, and also a surveillance recording system.

An expended casing that had been fired from a nine-millimeter firearm was found on the ground. A Taser was found in defendant's truck. A pair of scissors were found on the property that appeared to have blood stains on the handle.

Dr. Jolie Rodriguez was a forensic pathologist. She completed the autopsy on Hinden on October 6, 2020. He had a gunshot wound and blunt force injuries. Hinden died within minutes of being shot. Dr. Rodriguez could not determine whether Hinden could have been saved if medical aid would have been immediately administered. The cause of death was the gunshot wound.

The People presented several other witnesses who testified regarding the cannabis industry and that they were aware Hinden and defendant had a falling-out based on defendant selling exclusive strains of cannabis belonging to Hinden.

    2.    *DEFENSE*

Defendant recalled Dr. Rodriguez. She saw no Taser marks on Hinden's body.

Defendant called an evolutionary geneticist who specialized in medicinal plants and agriculture, including cannabis. She indicated there was a lot of fraud in the cannabis industry and plants were sold that were not what they were claimed to be. Cannabis was valued by the price it could get in the market and rarity. She agreed that some exclusive strains were not usually sold or there was an agreement that it could only be sold in

10

certain markets. It would be looked on poorly in the cannabis industry to sell or share such strains outside the agreement.

Mitchell Tavera was a former police chief who currently worked for a private company on use-of-force cases defending mostly law enforcement officers. He reviewed the video and other reports in the case. He did not believe that Hinden was hit with the Taser. Hinden reached with both hands to grab the right hand of defendant, which was holding the Taser, appearing to try to get control of the Taser. Tavera believed next that defendant appeared to bring up his left hand holding the firearm and pointed it toward Hinden's right facial area. The shot appeared to be fired while Hinden had both hands on defendant's right arm. Tavera did not believe that the video showed defendant attempted to shoot the gun a second time.

Dr. Mark Mills was a psychiatrist. He explained that people behave differently following a traumatic event. There was a myriad of ways that humans react when a catastrophic stress occurs. Right after such traumatic events, a person would be overwhelmed by hormonal changes and the shock as to what had occurred. He interviewed defendant on June 8, 2023, while defendant was incarcerated. He administered psychological tests to defendant. Defendant did not appear to be malingering or give evasive answers. He tested below average generally for aggression.

Defendant testified on his own behalf. Defendant claimed he put $50,000 into the PSV business. Defendant and Hinden had some problems when they first moved in together in California in 2016, and defendant returned to Florida for a period of time. He moved back to California in March 2017. By time, Hinden had found Lopez who

11

wanted to buy the John Street house as a grow house and defendant agreed to be the grower. Defendant moved into the John Street house and initially did not pay rent but ran the business. Hinden would obtain clones and defendant would care for them. Defendant believed they were the property of PSV.

Defendant and Hinden exchanged text messages in November 2019. On the evening of November 23, 2019, Hinden texted defendant, "Apparently I need to beat your ass instead." He then sent a message, "Bring the car back in the next 5 mins and give me the keys—figure out how you're going to get around." Defendant indicated the conversation had to do with Hinden claiming someone owed him money and that he wanted defendant to return Reese's car. Hinden suggested that defendant call him or that he be prepared to move in "johns" permanently. Defendant then sent the message "I'm not arguing with you I'm a grown man." Hinden responded with several messages about beating defendant and that he was to return Reese's car, which defendant was using. In late January 2020 defendant flew to Florida and arranged to have his own vehicle shipped to California. He also purchased a gun while in Florida and brought it with him on the plane back to California.

Defendant claimed that during their argument on January 2, 2020, Hinden "sucker" punched him. He denied he ever hit Hinden with a measuring cup. After the fight, defendant left; Hinden texted him, "Today is the last day you disrespect me. You want to play stupid like you don't why I swung on you then go ahead. I asked you a simple question, why didn't you come pick me up? Cuz you think I'm bitch was your answer. And that's exactly why I swung on you. You can't take responsibility for you

shit then we can be done today. [¶] despite the fact I think you completely deserved what happened tonight I'm still sorry I hurt you cuz despite how little you respect me I respect you and what we've accomplished together." Hinden later texted that he was sorry. The jury was shown a photograph of defendant's face after the incident, which showed bruising on his eye and injuries to his nose.

Defendant insisted that PSV ended on June 26, 2020. It was not making any money. Defendant started selling clones to make money. He admitted selling the clones for less than market value. He was not speaking with Reese or Hinden at this point but admitted sending messages to Reese. Defendant gave clones to a buyer on October 4, 2020, so he would make seeds for defendant. He claimed he signed a lease with Lopez in May 2020 to live in the John Street house. On June 26, 2020, Hinden sent a text to defendant, but defendant responded, "Stay from around me." Hinden responded, advising defendant that was a "puss" and that he "ain't shit."

Defendant testified regarding the text messages on October 5, 2020, between him and Hinden as previously set forth. Prior to Hinden's arrival, Hinden spoke with defendant on the phone. Hinden told him that because he had sold his clones, he was coming to the John Street house to burn down the house along with defendant. Defendant told him not to come to the house, but Hinden responded it was too late because he was turning down the street. Defendant believed that Hinden was going to harm him.

Defendant claimed that when Hinden got out of his car, he had a pair of scissors in his hand. He put the scissors in his pocket. Defendant was holding the Taser and the

13

firearm. Defendant pointed the gun at Hinden and told him to get off his property. Hinden told defendant he was going to burn the house down and walked into the backyard. Defendant followed him. Defendant did not want to shoot Hinden; he just wanted to scare him off the property. Hinden started breaking plants, which defendant claimed belonged to him.

Defendant threatened to use the Taser on Hinden. Hinden responded, "Go ahead, tase me. I'm going to kill you." Defendant followed Hinden and when he got close to him, Hinden turned and "lunged" at him. Defendant tried to tase Hinden but the Taser did not work. Defendant tried to push Hinden away with his left hand and the gun went off. He did not try to shoot him again.

Defendant reviewed the video. After the shooting he moved Hinden's body because he did not know if his neighbors were outside and he needed to find some time to "try to think." He thought Hinden was dead and that he could not help him. He walked around to find his cellular telephone then called his dad because his dad was his "safe place." He did not call the police because he was not sure what they "could do for me." He grabbed the surveillance devices because he thought they would "set the record straight." He denied he deleted anything from the devices. He drove to a nearby gas station and finally spoke with his dad. Defendant agreed to go back to the John Street house and surrender to the police. His dad called the police.

Defendant admitted he loaded the gun with four bullets before Hinden arrived at the property. He took the safety off the gun right when Hinden walked up but claimed he only planned to use the gun as a deterrent. Defendant could not tell if Hinden had a

14

lighter in his hand when he walked up; Hinden did not have gas cans. Defendant admitted to pulling the trigger on the firearm and that he was just "reacting." He never administered aid to Hinden because he thought Hinden was dead.

3. *REBUTTAL*

Michal Riley was a senior district attorney investigator for the Riverside County District Attorney's Office Bureau of Investigation. He had extensive experience with firearms. The firearm owned by defendant was tested. It could only be fired if the safety was off. To fire the gun, it would take five pounds of pressure on the trigger.

**DISCUSSION**

Defendant makes several claims of instructional error, which he argues requires the reversal of his involuntary manslaughter conviction. First, he contends the trial court erred by instructing the jury on involuntary manslaughter based on the lawful act of self-defense in a criminally negligent manner as opposed to being based on the crime of assault, as requested by defense counsel. The resulting instruction of criminal negligence in firing the gun in lawful self-defense was not a proper theory of involuntary manslaughter. Defendant further claims his due process rights were violated by the trial court failing to instruct the jury that self-defense was a complete defense to all homicides, including involuntary manslaughter. Defendant claims essentially that if the jury concluded that he acted in reasonable self-defense, it could not then conclude that defendant was guilty of involuntary manslaughter by killing someone in a criminally negligent manner while also making a finding of lawful self-defense. We agree and find

15

that the trial court gave an erroneous instruction on involuntary manslaughter requiring reversal.

A. ADDITIONAL FACTUAL HISTORY

During the discussion of the jury instructions, the trial court noted that defendant was requesting involuntary manslaughter instructions. Defendant requested that the trial court instruct the jury with CALCRIM No. 580 with the underlying crime being assault. The request also included the following language: "The People also allege that the defendant committed the following lawful acts with criminal negligence: self-defense." The court noted that CALCRIM No. 580[4] was not necessarily on point with the facts of

---

[4] The pattern CALCRIM No. 580 instruction provides, "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter.

The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner); [¶] 2. The defendant committed the (crime/ [or] act) with criminal negligence; [¶] AND [¶] 3. The defendant's acts caused the death of another person." The bracketed portion of CALCRIM No. 580 provides, "[The People allege that the defendant committed the following crime[s]: <insert misdemeanor[s]/infraction[s])/noninherently dangerous (felony/felonies)/inherently dangerous assaultive (felony/felonies)>. [¶] Instruction[s] tell[s] you what the People must prove in order to prove that the defendant committed <insert misdemeanor[s]/infraction[s]/ noninherently dangerous (felony/felonies)/inherently dangerous assaultive (felony/felonies)>.]" The instruction further defines criminal negligence.

16

the case. The trial court intended to use its own instruction.[5] The trial court did not find defense counsel's proposed instruction was proper because there was no evidence of assault. The trial court noted, "[I]f you're requesting an involuntary manslaughter consistent with the facts in this case, it would be that he was doing a lawful act, i.e., defending himself in a lawful manner, but if the jury elected, they could make the determination that his lawful self-defense was committed in a criminally negligent way, and that's why the proposed instruction under 580." Defense counsel made no other comment. The trial court denied the request for an instruction on accident or misfortune.

The jury was instructed on lawful self-defense (CALCRIM No. 505) that if defendant reasonably believed that he was in imminent danger of being killed or of suffering great bodily injury and used no more force than was necessary to defend against that danger, the killing was justified. It was advised that "The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified." The jury was advised it could consider whether Hinden had threatened defendant in the past. Defendant was not required to retreat, and the People had the burden of proving beyond a reasonable doubt that the killing was not justified.

The jury was then instructed with CALCRIM No. 506—that defendant was not guilty of murder if he killed to defend himself in his home. The killing was justified and not unlawful if, "1. The defendant reasonably believed that he was defending a home

_____

[5] Coincidently, the instruction was the exact same instruction as was used in defendant's first trial, which had resulted in a hung jury.

17

against Michael Hinden, who intended to or tried to commit arson of an inhabited dwelling home or murder; [¶] 2. The defendant reasonably believed that the danger was imminent; [¶] 3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; and [¶] 4. The defendant used no more force than was reasonably necessary to defend against the danger." The jurors were advised that if defendant used more force than was necessary, the killing was not justified. Defendant only needed to reasonably believe that such danger existed. CALCRIM No. 520 instructed the jury on murder and the two theories of premeditated and deliberate murder, and lying in wait murder. CALCRIM No. 548 instructed the jury that it did not have to agree on the theory but must unanimously agree on the degree of murder.

The jury was then instructed with CALCRIM No. 521. It was advised, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable."

The jury was then instructed with CALCRIM No. 580 as follows: "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and

18

consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed a lawful act in an unlawful manner; [¶] 2. The defendant committed the act with criminal negligence; and [¶] 3. The defendant's acts caused the death of another person. [¶] The People allege that the defendant committed the following lawful act with criminal negligence: self-defense and defense of property. [¶] Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when. [¶] "1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; and [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act." The instruction also defined great bodily injury.

During opening argument, the prosecutor argued that defendant was lying in wait for Hinden in order to kill him. In addition, the killing was willful and premeditated. The prosecutor painted defendant as a callous, cold killer by refusing to help Hinden and

19

concealing his body. The prosecutor argued self-defense did not apply based on defendant using more force than was necessary.

Defendant's counsel in response argued that the case came down to the video and the "minute or so" altercation between defendant and Hinden. Defendant's counsel argued that defendant had a right to defend his property, had the right to possess a gun on his property, and was entitled to use the gun in lethal ways. Defense counsel argued regarding involuntary manslaughter "So let's assume [defendant], not only does he shoot [Hinden], but he then shoots the gun in the air a bunch of times and hits like somebody who's walking by. Well, he was defending himself at that time, but he was reckless by shooting so many shots and ended up hitting an innocent bystander. None of those are what the case is." Defense counsel further argued that self-defense was a complete defense to murder. In response, the prosecutor argued that defendant used more force than was necessary and could not claim self-defense. The prosecutor rejected that defendant was guilty of involuntary manslaughter as it was proven that he had the intent to kill.

After the jury verdict, while discussing the aggravating factors, the trial court noted that by finding defendant not guilty of first degree and second degree murder and voluntary manslaughter, the jury had to find he acted in either self-defense or defense of his property, which meant they believed he had a reasonable belief that he was in danger of death or great bodily injury and needed to use deadly force, which was no more force than necessary. The trial court noted that based on the involuntary manslaughter instruction, the jury concluded that defendant was criminally negligent in the manner in

20

which he defended himself.  The trial court also noted at sentencing, "The[ jury] finding was that [defendant], in a lawful act of self-defense, was criminally negligent in how he did it, and his criminally negligent manner resulting in an involuntary manslaughter."

B.     INVOLUNTARY MANSLAUGHTER INSTRUCTION

" ' "It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence" ' and ' "necessary for the jury's understanding of the case." ' [Citations.]  It is also well settled that this duty to instruct extends to defenses 'if it appears … the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 73.)  "In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant.  [Citation.]  We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1013.)

Here, as set forth, *ante,* the jury was instructed on murder, manslaughter, involuntary manslaughter, perfect self-defense and imperfect self-defense.  " 'Murder is the unlawful killing of a human being . . . with malice aforethought.' " (*People v. Elmore* (2014) 59 Cal.4th 121, 132.)  Manslaughter is "the unlawful killing of a human being without malice." (Pen. Code, § 192.)  "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances:  either when the

21

defendant acts in a "sudden quarrel or heat of passion" [citation], or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88 (*Blakeley*).)

"[A] defendant commits *in*voluntary manslaughter by committing a homicide with the mens rea of criminal negligence. [Citation.] The offense must be based on one of three predicate acts: (1) killing in the commission of a misdemeanor (§ 192, subd. (b)); (2) killing 'in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection' (*ibid*.); or (3) killing in the commission of 'a noninherently dangerous felony . . . "committed without due caution and circumspection." ' [Citation.] 'The performance of an act with criminal negligence supplies the criminal intent for involuntary manslaughter, regardless whether the conduct underlying the offense is a misdemeanor, a lawful act, or a noninherently dangerous felony.' " (*People v. Sevilla* (2025) 115 Cal.App.5th 618, 626.)

"A killing in perfect self-defense is justifiable homicide. Perfect self-defense requires that one must actually and reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. Imperfect self-defense reduces an intentional and unlawful killing to voluntary manslaughter. Imperfect self-defense occurs when defendants act in the actual but unreasonable belief they are in imminent danger of great bodily injury or death." (*People v. Odell* (2023) 92 Cal.App.5th 307, 321; see also *People v. Lewis* (2001) 25 Cal.4th 610, 645.)

In *Blakeley*, *supra*, 23 Cal.4th 82, the Supreme Court found, "[W]e hold in a case of first impression that voluntary manslaughter is also committed when a defendant, acting with conscious disregard for life and the knowledge that the conduct is life-endangering, unintentionally but unlawfully kills while having an unreasonable but good faith belief in the need to act in self-defense." (*Id.* at p. 85.) It first noted the differences between murder and the offense of manslaughter. (*Id.* at pp. 87-88.) It then addressed, "But what offense is committed when a person, acting with a conscious disregard for life, unintentionally kills a human being, but the killing occurs in unreasonable self-defense? Is the killer guilty of murder, voluntary manslaughter, or involuntary manslaughter?" It stated, "[W]e conclude that when a defendant, acting with conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary, not involuntary, manslaughter." (*Id.* at pp. 88-89.)

The Supreme Court noted that, '[W]hen defendant killed [the victim] this court had not yet addressed the issue of whether an unintentional killing in unreasonable self-defense is voluntary or involuntary manslaughter. But three decisions by the Courts of Appeal in this state held that such a killing was only involuntary manslaughter [citations]; no case held to the contrary. Thus, our decision today—that one who, acting with conscious disregard for life, unintentionally kills in unreasonable self-defense is guilty of voluntary manslaughter rather than the less serious crime of involuntary manslaughter— is an unforeseeable judicial enlargement of the crime of voluntary manslaughter, and thus may not be applied retroactively to defendant.' " (*Blakeley*, *supra*, 23 Cal.4th at p. 92.)

23

Justice Mosk dissented, reasoning that an unintentional killing in imperfect self-defense could be either voluntary or involuntary manslaughter. (*Blakeley*, *supra*, 23 Cal.4th at pp. 98-99 (dis. opn. of Mosk, J.).) He concluded that, while provocation reduces murder to manslaughter because the killing is deemed to be without malice, even though the defendant in fact harbors malice, imperfect self-defense may factually negate malice. (*Id.* at pp. 96-98.) When imperfect self-defense factually negates malice, the defendant could not be convicted of voluntary manslaughter but could only be guilty of involuntary manslaughter. (*Id.* at pp. 96-98.) "[A]n actual, but unreasonable, belief in imminent danger of death or great bodily injury may prove to be preclusive with respect to the mental state required for voluntary manslaughter, namely, a state of mind that amounts in fact to malice aforethought." (*Id.* at p. 98.) The *Blakeley* majority addressed the dissenting opinion, noting, "In his dissenting opinion in this case, Justice Mosk contends that a defendant who kills in unreasonable self-defense may sometimes be guilty of involuntary manslaughter. We have no quarrel with this view. We conclude only that a defendant who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter." (*Id.* at p. 91.)

Neither the majority nor the dissenting opinion in *Blakeley* addressed lawful self-defense and criminal negligence as a proper theory for involuntary manslaughter. Here, CALCRIM No. 580 allowed the jury to convict defendant based on it finding that defendant was engaged in lawful self-defense, which as noted by defendant and seemingly agreed to by The People, is a complete defense against involuntary

24

manslaughter. The instruction given here essentially asked the jury to go a step further after finding lawful self-defense and determine whether defendant shot Hinden in a negligent manner.

However, the jury could not find that defendant committed a lawful act of self-defense if they found that defendant went too far with his self-defense by acting with criminal recklessness, as he would no longer be committing a lawful act. The jurors were instructed on lawful self-defense—that they must find defendant used no more force than was reasonably necessary to defend against danger either to himself or his property. Based on the instruction on involuntary manslaughter, the jurors had to first determine if defendant was engaged in a lawful act (which, based on the instructions, required it to find that he acted in perfect self-defense), which necessarily required a finding that he used force that was reasonably necessary. It was not necessary for the jury to then consider whether the shooting of Hinden was criminally negligent as such finding is subsumed in the finding of lawful self- defense. Simply put, the CALCRIM No. 580 instruction—as worded—made no sense based on the evidence that (1) defendant shot one time at Hinden at close range; (2) defendant admitted to pulling the trigger; and (3) he claimed to be acting in self-defense. The decision was already made by the jury that defendant acted reasonably in shooting Hinden by finding beyond a reasonable doubt that he acted in lawful self-defense.

The People claim that based on the involuntary manslaughter instruction, the jury could have "found that [defendant]'s conduct in discharging the gun during the struggle with the victim (the actus reus) recklessly created a high risk of death that was

25

objectively unreasonable (the mens rea)." However, this was essentially the question before the jury in the determination of perfect self-defense: whether the use of force was reasonable. In determining criminal negligence, the jury considers whether the defendant acted in a reckless way and in a way that is different from how an "ordinary" person would act in the same situation. Based on the instruction given to the jury (which, as requested by defendant, did not include a crime e.g. assault) the jury necessarily had to conclude that defendant was acting in lawful self-defense, which included that he used reasonable force. Such lawful defense was a complete defense to the crime.[6] CALCRIM No. 580 as given to the jury in this case was not a valid theory of involuntary manslaughter, based on the facts in this case,[7] as once the jury found that he was engaged in lawful self-defense by concluding his use of force was reasonable, he was not guilty of murder or voluntary or involuntary manslaughter.

---

[6] We note defendant requested that the jury be instructed with CALCRIM No. 580 conceivably inviting such error. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [" 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest' " ].) However, the trial court rejected the wording of the instruction proffered by defendant's counsel and drafted its own version. The instruction proffered by defendant comported with the law in that it identified the underlying crime of assault. Invited error does not apply here.

[7] Defendant's counsel argued that such instruction may be applicable to a situation where a defendant shot not only the victim but also other innocent bystanders by shooting into the air. These are not the facts in this case where defendant only shot once at the victim at close range. We express no opinion as to whether such instruction would be proper under the facts argued by defendant.

The People's sole argument that such instruction was proper was that it was based on "substantial evidence" and that no evidence supported an instruction of assault as the lawful act. The People recognize that defendant is arguing that the " 'lawful act of self-defense or defense of property' is a complete defense to homicide and there can be no valid theory of involuntary manslaughter for an act of 'lawful self-defense' carried out with criminal negligence under the facts of this case." The People simply reply, "As worded, the trial court's involuntary manslaughter instruction correctly instructed the jury on a valid theory of law that was supported by substantial evidence." The People have provided no pertinent legal authority supporting that the lawful act of self-defense or defense of property can result in a conviction of involuntary manslaughter based on criminal negligence. As noted in *Blakeley*, the dissent discussed a possible theory of involuntary manslaughter based on *unreasonable* self-defense, not reasonable self-defense. This court has found no authority for the instruction on involuntary manslaughter based on reasonable self-defense, which is a complete defense to murder, manslaughter and involuntary manslaughter.

The People further address the jury being instructed with CALCRIM No. 571. The trial court advised the jurors that if they concluded that defendant "acted in complete self-defense, *his action was lawful and you must find him not guilty of any crime*." The People argue that the jury would have been aware that this equally applied to involuntary manslaughter. The People argue that it is not reasonably probable that the jury chose to exclude the application of perfect self-defense to involuntary manslaughter. If that were true, then the jury would have found that defendant committed a lawful act—self-defense

27

or defense of property. Once that occurred, defendant was not guilty. The People have provided no authority or argument how the jury could then conclude that although defendant was acting in perfect self-defense, the jury could find him guilty of involuntary manslaughter.

The People next argue that imperfect or unreasonable self-defense is a valid theory of liability for involuntary manslaughter. The People refer to *Blakeley* and other cases that find *imperfect* self-defense may reduce murder to voluntary or involuntary manslaughter. The People seem to conclude that the jury could properly convict defendant of involuntary manslaughter based on imperfect self-defense. However, as noted by defendant, the jury necessarily rejected imperfect self-defense by finding him not guilty of voluntary manslaughter. Further, the instructions given never addressed imperfect self-defense as it applied to involuntary manslaughter. In fact, CALCRIM No. 580 required that defendant was engaged in lawful self-defense. While The People argue that unreasonable self-defense is a valid theory for involuntary manslaughter, that was not a theory presented to the jury. The record does not support that the jury made a finding of unreasonable self-defense in this case, and *Blakeley*, which defendant relies on, does not address involuntary manslaughter as it pertains to perfect self-defense. The trial court erred in giving CALCRIM No. 580 to the jury as worded.

" ' " In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1172.) We need not

28

determine whether the instructional error here is subject to the *People v. Watson* (1956) 46 Cal.2d 818, 836, "reasonably probable" standard or the more stringent federal harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, as the conviction should be reversed under either standard.

Here, the jury found defendant not guilty of first degree and second degree murder based on the finding that defendant acted in lawful self-defense in shooting defendant. It further found defendant not guilty of voluntary manslaughter rejecting that unreasonable self-defense was applicable. It found defendant guilty of involuntary manslaughter, finding, as recognized by the trial court, that defendant, "in a lawful act of self-defense, was criminally negligent in how he did it, and in his criminally negligent manner resulting in an involuntary manslaughter." As we have concluded, such determination was not a valid theory of involuntary manslaughter. There was no other theory of involuntary manslaughter presented to the jury. Here, the only question for the jury was whether defendant acted in reasonable self-defense in shooting Hinden one time in the face. Once it concluded that such use of force was reasonable, it found lawful self-defense, which was a complete defense to involuntary manslaughter. The jury necessarily relied on the erroneous instruction to convict defendant of involuntary manslaughter after finding the complete defense of justifiable homicide. The error was prejudicial. Since we have found that the involuntary manslaughter conviction must be reversed, we find no reason to address the additional instructional error arguments raised by defendant or address his sentencing and custody credit arguments.

C.    RETRIAL

Defendant contends that "retrial should be barred" because the jury found beyond a reasonable doubt that he acted in perfect self-defense and defense of property and found him not guilty of murder and voluntary manslaughter.  In response, the People argue that the jury was properly instructed on self-defense and defense of property "and found that the evidence established [defendant]'s guilt of involuntary manslaughter based upon [defendant]'s criminally negligent act of self-defense, i.e. shooting the victim.  The jury's acquittal on voluntary manslaughter did not preclude a finding of unintentional and unreasonable self-defense that met the elements for involuntary manslaughter, as discussed *ante*."  The People further have rejected that the facts supported an alternative theory of involuntary manslaughter under a theory of assault.  The People fail to provide this court with a valid argument that retrial of defendant is appropriate in this matter, and we therefore do not order retrial on the involuntary manslaughter.

D.    REMAINING CONTENTIONS

Defendant's opening brief claims he is entitled to remand for resentencing as the trial court erroneously relied on aggravating factors in sentencing him to the middle term on the firearm enhancement, and that he is entitled to additional custody credit.

We are reversing defendant's conviction of involuntary manslaughter; therefore, these issues are moot because we can offer no further relief.

30

# DISPOSITION

Defendant's conviction of involuntary manslaughter is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

Acting P. J.


We concur:


CODRINGTON _____

J.


FIELDS _____

J.